IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MICHAEL TUTTLE, et al.,<br><br>          Plaintiffs,<br><br>     vs.<br><br>FRONT STREET AFFORDABLE<br>HOUSING PARTNERS, et al.,<br><br>          Defendants. | CIVIL NO. 18-00218 JAO-KJM<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST THROUGH THIRD CLAIMS FOR RELIEF AND DENYING ALL OTHER PENDING MOTIONS** |

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST THROUGH THIRD CLAIMS FOR RELIEF AND DENYING ALL OTHER PENDING MOTIONS**

This case centers around the Front Street Apartments, an apartment complex on Maui previously maintained as low-income housing pursuant to a federal tax program. The Court must determine whether the State of Hawai'i properly granted the owner's request to be released from its commitment to maintain the Front Street Apartments as low-income housing, or instead, whether that low-income commitment must be reinstated under federal and state law.

The Plaintiffs—Michael Tuttle, Chi Pilialoha Guyer, Joseph Vu, and Shazada Rayleen Yap ("Plaintiffs")—are current or prospective tenants of the

Front Street Apartments.  Defendant Front Street Affordable Housing Partners

("FSA") owns and operates Front Street Apartments.  Defendant Hawaiʻi Housing

Finance & Development Corporation ("HHFDC" or "the State") is the state agency

that assists with implementing the federal low-income tax credit program in the

State of Hawaiʻi, and Defendant Craig K. Hirai is sued in his official capacity as

the Executive Director of that agency.

Before the Court are the parties' various cross-motions for summary

judgment—seven in total—all disputing whether the low-income commitment was

properly terminated or must instead be reinstated.  For the reasons discussed

below, the Court GRANTS Plaintiffs' motion as to their first three claims for

relief, and otherwise DENIES the parties' motions.

## I.      BACKGROUND

## A.      Background on the Low-Income Housing Tax Credit Program

The Low-Income Housing Tax Credit ("LIHTC") Program aims to

encourage the development of affordable rental housing by providing federal tax

credits to qualified project owners who agree to maintain all or a portion of a

project's rental units for low-income individuals or families.  *See* Tax Reform Act

of 1986, Pub. L. No. 99–514, § 252, 100 Stat. 2085, 2189–208 (codified at 26

U.S.C. § 42).  The regulations governing the LIHTC program are contained in

Section 42 of the Internal Revenue Code.  Congress apportions tax credits, based

on population, to state housing credit agencies, which then allocate these credits to those who invest in affordable housing projects.  *See* 26 U.S.C. § 42(g)(1), 42(h)(3).  State housing credit agencies allocate the federal tax credits within their respective states pursuant to a Qualified Allocation Plan ("QAP"), which sets out that state's eligibility priorities and criteria for awarding federal tax credits, as well as the method of monitoring compliance with the provisions of the LIHTC program.  *See id.* § 42(m)(1)(B); *see also, e.g.*, ECF No. 200-2 at 1.

Among other things, Section 42 requires project owners to enter into agreements (an "extended low-income housing commitment") with state housing credit agencies to receive tax credits under the LIHTC program during an "extended use period."  26 U.S.C. § 42(h)(6)(A)–(B).  At a minimum, these agreements must:  require a certain number of the units in the project be kept affordable during the extended use period; allow past, present, or prospective tenants who meet the income limitations to enforce these affordability requirements; prohibit certain conduct like piecemeal disposition of the project or discrimination against individuals with Section 8 housing vouchers; and require that the agreement be binding on any successors.  *See id.*  The agreement must also be "recorded pursuant to State law as a restrictive covenant."  *Id.* § 42(h)(6)(B)(vi).

The length of time a project must be maintained as low-income housing and comply with these requirements consists of a "compliance period" within the

"extended use period."  The compliance period is the first fifteen years.  *Id.* §

42(i)(1).  The extended use period begins on the first day of that compliance period

and ends thirty years later, unless a later date is specified in the project owner's

agreement with the housing agency, in which case that later date controls.  *See id.*

§ 42(h)(6)(D).

Section 42 provides two "exceptions" to the requirement that a project be

maintained as low-income housing throughout the duration of the extended use

period.  *Id.* § 42(h)(6)(E)(i).  First, the extended use period "shall terminate" on the

date the building is acquired by foreclosure or instrument in lieu of foreclosure.  *Id.*

§ 42(h)(6)(E)(i)(I) (sometimes referred to as "Subclause I").  Second, the extended

use period may terminate if the building owner exercises a "qualified contract"

option.  *Id.* § 42(h)(6)(E)(i)(II) (sometimes referred to as "Subclause II").

Under the qualified contract exception, the project owner submits a written

request to the state housing credit agency to find a buyer who will continue

operating the building as low-income housing.  *See id.*; *see also id.* § 42(h)(6)(I).

State housing agencies must offer or advertise qualified contract requests "to the

general public, based on reasonable efforts."  26 C.F.R. § 1.42-18(d)(2).  The State

has not promulgated rules regarding the reasonable efforts it will use to offer or

advertise qualified contracts during the one-year period.  *See* ECF No. 178 ¶ 10.  If

the state housing credit agency is unable to find a qualified buyer within one year,

the extended use period is terminated, i.e., the affordability limitations are lifted. *See* 26 U.S.C. § 42(h)(6)(E)(i)(II), 42(h)(6)(I).

The qualified contract exception only becomes available after the fourteenth year of the compliance period, which ensures that even if the state housing credit agency is unable to find a qualified buyer within the one-year search period, the project is maintained as low-income housing for at least fifteen years. *See id.* § 42(h)(6)(I). In addition—and crucial to the dispute before the Court—the qualified contract option "shall not apply to the extent more stringent requirements are provided in the agreement or in State law." *Id.* § 42(h)(6)(E)(i)(II).

## B.    Facts[1]

With that regulatory background in mind, the Court turns to the specific dispute over the LIHTC program on Maui. Plaintiffs Guyer, Tuttle, and Vu are tenants of Front Street Apartments, located in Lahaina. *See* ECF No. 42 ¶ 1.[2] Defendant FSA owns and operates the Front Street Apartments housing project (the "Project"), and has done so since the Project's first occupancy in 2001; FSA is also the ground lessee of the property on which the Project is situated. *See id.* ¶¶ 3,

---

[1] Unless otherwise indicated, the following facts are undisputed.

[2] In Plaintiffs' briefing, Plaintiff Yap is described as a prospective tenant of Front Street Apartments. *See* ECF No. 175 at 21. For these motions, though, no evidence was submitted regarding Plaintiff Yap, and Plaintiffs' counsel apparently intends to dismiss Plaintiff Yap. *See* ECF No. 200-1 ¶ 2.

5.[3]  Defendant HHFDC is the state housing credit agency designated to administer and allocate the LIHTC program in Hawai'i pursuant to 26 U.S.C. § 42.  *See id.* ¶¶ 2, 6.[4]

In 1999, FSA applied for tax credits for the Project through the State's LIHTC program.  *See id.* ¶ 7.  In that application, FSA indicated it would maintain the Project as affordable housing for 30 years.  *See* ECF No. 42-1 at 13.  In subsequent discussions, FSA indicated that the affordability period would be increased from 30 years to 51 years and so the 51-year affordability period was added as a project-specific condition.[5]  *See* ECF No. 190-1 at 7, 10–11, 14–15, 22.

---

[3]  Plaintiffs initially named the previous fee owner and ground lessor, 3900 LLC, as a defendant in this action and 3900 LLC, in turn, brought cross claims against FSA; however, the parties stipulated to dismiss 3900 LLC.  *See* ECF No. 42 ¶ 4; ECF No. 152.  During the pendency of this litigation, the State acquired the fee interest in the property.  *See* ECF No. 178 ¶ 13.

[4]  HHFDC is the successor-in-interest to the Housing and Community Development Corporation of Hawai'i ("HCDCH").  *See* ECF No. 42 ¶ 2.  For simplicity, the Court will refer only to HHFDC or the State even if, at the relevant time, the agency was HCDCH.

[5]  The scoring summary for FSA's application awarded FSA two points out of a possible six under the criteria related to whether the project would provide low-income housing for a longer period than required under Section 42.  At the hearing, counsel for HHFDC acknowledged that it is unclear why FSA received only two points under the criteria when it otherwise appeared to deserve five points.  *See* ECF No. 190-1 at 21; *see also* ECF No. 200-2 at 4 (Hawaii's 1999 QAP indicating applicant would receive two points if the project were affordable for 21–30 years under the restrictive covenant document, and five points if the project were affordable for 51–60 years under the restrictive covenant document).

In 2002, FSA, the State, and the then-current owner of the property entered into a "Declaration of Restrictive Covenants" (the "Declaration"), which was duly recorded with the Bureau of Conveyances of the State of Hawaiʻi.  ECF No. 42 ¶ 8. The Declaration contains the necessary covenants described above as required under 26 U.S.C. § 42(h)(6).  *See generally* ECF No. 42-2.  Relevant here, FSA agreed that in consideration for receiving tax credits, beneficiaries, i.e., those who meet the income requirements (whether former, present, or prospective tenants) may enforce FSA's obligations under the Declaration.  *See id.* at 7–8.  The Declaration is governed by Hawaiʻi law, except where federal law is applicable. *See id.* at 9.  And the Declaration sets forth an "Extended Use Period" of 51 years, and provides that FSA must comply with the requirements of Section 42 regarding the Extended Use Period unless it terminates through acquisition of the Property through foreclosure or instrument in lieu of foreclosure.  *Id.* at 7.

There has been no foreclosure and no instrument in lieu of foreclosure exists.  *See* ECF No. 42 ¶ 9.  FSA did, however, seek to terminate the extended use period through the qualified contract exception provided under Section 42.  In or around October 2014, FSA asked the State whether it was eligible to apply for a qualified contract under Section 42 and the QAP then in effect.  *See id.* ¶ 10.  In January 2015, FSA again requested that the State confirm the Project's compliance and FSA's eligibility to submit a qualified contract application.  *See id.* ¶ 11.  The

State responded that FSA was eligible to request a qualified contract.  *See id.* ¶ 12; *see also* ECF No. 42-4.  On August 5, 2015, FSA submitted a qualified contract request application to the State, and in September the State responded to confirm that it had accepted this request.  *See* ECF No. 42 ¶¶ 13–14.  If the State properly extended the qualified contract option to FSA, the State had one year, or until August 4, 2016, to secure a qualified buyer or the affordability restrictions would terminate.  *See id.* ¶ 15.

Previously, in July 2015, an appraiser determined that the fair market value of the Project's leasehold property was $8,710,000; however, as of December 31, 2014, the qualified contract price per Section 42 was $15,395,813.  *See id.* ¶ 21. Given this difference, a finance specialist for the State calculated that a potential buyer would face a financing shortfall of about $6 to $11 million depending on what financing option was used, and therefore in April 2016 recommended to Defendant Hirai that the State minimize marketing and listing costs because it was unlikely a qualified buyer could be found for the Project.  *See* ECF No. 162 ¶¶ 9– 10.  Defendant Hirai approved this recommended course of action in April 2016. *See id.* ¶ 11.  The State first posted an offer for FSA's qualified contract on its website on May 24, 2016—over ninth months after FSA filed its application and less than three months before the one-year period expired.  *See* ECF No. 42 ¶ 16. This was the only action the State took to advertise the qualified contract.  *See* ECF

No. 178 ¶ 12.  The State did, however, receive three inquiries about the sale of the Project and sent the relevant information to those who had inquired; it did not hear back from them with further interest in acquiring the Project.  *See* ECF No. 162 ¶ 13.

The State did not secure a buyer within the one-year period.  *See* ECF No. 42 ¶ 17.  In September 2016, the State informed FSA it had not received any offers to purchase the Project and was unable to secure a buyer or present a qualified contract to FSA for the qualified contract price of $15,395,813.  *See id.* ¶ 18. Thus, in December 2016, the State executed a "Release of Declaration of Restrictive Covenants for Low-Income Housing Credits" (the "Release").  *See id.* ¶ 19.  The Release, also governed by Hawaiʻi law, terminated and released the Declaration.  *See* ECF No. 42-7 at 2.  Neither the State—nor any of the other signatories to the Declaration—obtained Plaintiffs' consent before the State executed the Release.  *See* ECF No. 178 ¶ 8.

In February 2017, FSA posted notice to tenants that the LIHTC restrictions would be lifted on August 4, 2019, at which time FSA would be able to set rents at its discretion.[6]  *See* ECF No. 42 ¶ 20.  Plaintiffs Tuttle, Guyer, and Vu still meet

---

[6] Under the terms of the Release, the affordability restrictions were to remain in place until that date.  *See* ECF No. 160 ¶ 14.  Pursuant to a joint stipulation, FSA agreed to continue maintaining reduced rental rates beyond August 2019 for those Plaintiffs who are current tenants of Front Street Apartments.  *See* ECF No. 114-1.

the income requirements to qualify for housing assistance under the LIHTC program.  *See* ECF No. 178 ¶ 6.  Plaintiffs contend that, prior to the Release, they relied on the low-income rent restrictions in effect at Front Street Apartments, and now continue to rely on those rent restrictions and would be unable to afford an apartment without them.  *See id.* ¶¶ 7, 9.  While the State does not dispute Plaintiffs' representations, *see* ECF No. 202 ¶ 15, FSA contends that Plaintiffs cannot say whether they are relying on rent restrictions and would be unable to afford rent without knowing what rental rates FSA will actually set once restrictions are lifted, *see* ECF No. 204 ¶ 3.

## C.    Procedural History

Plaintiffs first filed this action in state court in May 2018, and Defendants removed the action to this Court.  ECF No. 1.  The operative pleading, the Third Amended Complaint, brings the following claims for relief:  First Claim for Relief (against FSA)—Breach of the Declaration; Second Claim for Relief (against FSA)—Breach of the Declaration; Third Claim for Relief (against all Defendants)—Breach of the Declaration; Fifth Claim for Relief[7] (against HHFDC)—Failure to Promulgate Rules; Sixth Claim for Relief (against HHFDC)—Violation of Due Process under Article I, Section 5 of the Constitution

---

[7] Plaintiff's Fourth Claim for Relief was intentionally left blank.  *See* ECF No. 109.

of the State of Hawaiʻi; and Seventh Claim for Relief (against Mr. Hirai)—42

U.S.C. § 1983 Violation of Due Process under the Fourteenth Amendment to the

United States Constitution.  ECF No. 109.

The parties previously filed summary judgment motions that were

withdrawn without prejudice to allow additional time for legislative action that

might narrow or eliminate the need for dispositive motions in this case.  *See* ECF

No. 115; *see also* ECF No. 175 at 4.  Because the legislature's efforts to resolve

Plaintiffs' claims were not effective, and settlement efforts have similarly failed,

the parties refiled the present motions.

Currently before the Court are:

> (1) the State and Mr. Hirai's motion for summary judgment on
> Plaintiffs' Third Claim for Relief, which FSA has joined, *see*
> ECF Nos. 159, 160, 178, 181, 184, 185, 193;
> (2) the State's motion for summary judgment on Plaintiffs' Fifth
> Claim for Relief, which FSA has joined, *see* ECF Nos. 161,
> 162, 176, 178, 181, 191;
> (3) the State and Mr. Hirai's motion for summary judgment on
> Plaintiffs' Sixth and Seventh Claims for Relief, which FSA
> has joined, *see* ECF Nos. 163, 164, 177, 178, 181, 192;
> (4) FSA's motion for summary judgment on Plaintiff's First
> through Third Claims for Relief, which the State and Mr.
> Hirai have joined, *see* ECF Nos. 179, 180, 189, 190, 194, 199,
> 200;
> (5) Plaintiffs' motion for summary judgment on their First
> through Third Claims for Relief, *see* ECF Nos. 175, 178, 201,
> 202, 203, 204, 205, 206, 207;
> (6) Plaintiffs' counter-motion for summary judgment on their
> Fifth Claim for Relief, *see* ECF Nos. 176, 178, 191, 197; and

(7) Plaintiffs' counter-motion for summary judgment on their Sixth and Seventh Claims for Relief, *see* ECF Nos. 177, 178, 192, 198.

The Court held a videoconference hearing on these motions on August 5, 2020.  *See* ECF No. 213.

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  But the moving party need not disprove the opposing party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  *See id.* at 323–24; Fed. R. Civ. P. 56(c)(1).

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues."  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992) (citation omitted).  Rather, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing

the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (internal quotation marks and ellipsis omitted).

## III.   DISCUSSION

### A.   Breach of the Declaration (First through Third Claims for Relief)

Plaintiffs' first three claims for relief are premised on the argument that the qualified contract option was not available to FSA, meaning the Release the State executed pursuant to that option is void and the Declaration should therefore be reinstated.

#### 1.   Interpreting the Declaration

As required under Section 42, the relevant agreement here was recorded pursuant to State law as a restrictive covenant, and explicitly states that it is governed by Hawaiʻi law (except, where applicable, it is governed by federal law). *See* ECF No. 42-2.  The analysis must therefore begin with the language of the Declaration as construed under Hawaiʻi law.

In construing a restrictive covenant governing the use of land, Hawaiʻi courts are guided by the same rules that apply when construing contracts.  *See Pelosi v. Wailea Ranch Estates*, 10 Haw. App. 424, 435–36, 876 P.2d 1320, 1326–27 (1994).  "The fundamental rule is that the intent of the parties, as gleaned from the entire context of the covenant, governs," *id.* at 436, 876 P.2d at 1327, and the parties' intentions are determined from the language used, *see Waikiki Malia*

*Hotel, Inc. v. Kinkai Props. Ltd.*, 75 Haw. 370, 384, 862 P.2d 1048, 1057 (1993).

In determining the meaning of language used in a restrictive covenant, *expressed* intent is controlling and unexpressed intent is generally unavailing.  *See id.* at 394, 862 P.2d at 1062.  As long as the terms of a covenant are not ambiguous, i.e., not reasonably subject to more than one interpretation, a court must interpret a covenant's terms according to their plain, ordinary, and accepted sense in common speech.  *See Pelosi*, 10 Haw. App. at 436, 876 P.2d at 1327.

With regard to the duration of the extended low-income housing commitment that FSA made here, the Declaration provides:

> SECTION 5 - TERM OF AGREEMENT.
>
> (a) Except as hereinafter provided, this Agreement and the Section 42 Occupancy Restrictions specified herein shall commence with the first day in the Project period on which any building which is part of the Project is placed in service and shall end on the date which is thirty-six (36) years after the close of the initial 15-year compliance period, for a total of fifty-one (51) years ("Extended Use Period").
>
> (b) Notwithstanding subsection (a) above, the Owner shall comply with the requirements of Section 42 of the Code relating to the Extended Use Period unless the Extended Use Period for this Project shall terminate through acquisition of the Project by foreclosure or instrument in lieu of foreclosure if in accordance with the regulations promulgated by the Code.

ECF No. 42-2 at 7.  The Declaration thus provides for early termination of the extended use period *only* in the event of foreclosure or an instrument in lieu of foreclosure.  But for that occurrence, the Section 42 requirements, i.e., affordability

14

restrictions, shall be maintained for a total of 51 years.  Thus, under the plain and unambiguous terms of the Declaration, the expressed intent was that the only exceptions to the mandated extended use period were foreclosure and instrument in lieu of foreclosure, rendering the qualified contract exception unavailable.[8]

### 2.    Whether Section 42 Alters the Plain Language of the Declaration

The State and FSA nonetheless point to the fact that the qualified contract option is provided within Section 42, arguing FSA therefore had a right to take advantage of it.  The Court disagrees.  Although Section 42 provides for the

---

[8]  Because the Court concludes the Declaration is unambiguous, it cannot consider the declarations Defendants rely on to argue in favor of an alternative, unexpressed intent.  *See Waikiki Malia Hotel*, 75 Haw. at 385, 862 P.2d at 1058 ("If the language of the deed is ambiguous, surrounding circumstances may be considered but not parol evidence."); *cf. Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 124–25, 839 P.2d 10, 31 (1992) ("[P]arol evidence regarding the parties' intent as to the language used in a contract may be considered only when the contract language is ambiguous." (citation omitted)).  In any event, Defendants have not explained how this evidence constitutes the type of "surrounding circumstances" that may be considered when a restrictive covenant is deemed ambiguous.  *See Waikiki Malia Hotel*, 75 Haw. at 385, 862 P.2d at 1058 ("The use of surrounding circumstances, also known as extrinsic evidence, usually concerns the geographical location of the lands and the physical condition of the structures thereon." (internal quotation marks and citation omitted)); *see also id.* (citing *Stegall v. Hous. Auth. of City of Charlotte*, 278 N.C. 95, 100, 178 S.E.2d 824, 828 (1971) ("Ordinarily this intention must be ascertained from the deed itself, but when the language used is ambiguous it is proper to consider the situation of the parties and the circumstances surrounding their transaction.  However, this intention may not be established by parol.  *Neither the testimony nor the declaration of a party is competent to prove intent.*" (emphasis added))).

extended use period to terminate based on foreclosure/instrument in lieu of

foreclosure (Subclause (I)) or a property owner exercising a qualified contract

option (Subclause (II)), Section 42 also provides:

> Subclause (II) shall not apply to the extent more stringent requirements are provided in the agreement or in State law.

26 U.S.C. § 42(h)(6)(E)(i)(II).[9]

Here, more stringent requirements are provided in Section 5 of the

Declaration, namely that the extended use period and requirements under it must

be maintained for 51 years unless a foreclosure occurs or there is an instrument in

lieu of foreclosure.  This 51-year requirement was not immaterial.  Instead, both

the Declaration itself and other evidence related to the State's allocation decision

demonstrate this extended use period was an explicit condition of FSA receiving

tax credits, with the Declaration providing:

> WHEREAS, the Owner has represented to the Corporation in the Owner's Application that it will covenant to maintain the Section 42 rent and income restrictions *for an additional 36 years beyond the minimum 15 year compliance period, through the year as set forth in Section 5 of this Agreement*[.]

ECF No. 42-2 at 2 (emphasis added).[10]

---

[9]  Plaintiffs refer to this clause as the flush language and the Court will do the same.

[10]  *See also* ECF No. 190-1 at 7 ("In response to staff's inquiries as to whether the

(continued . . .)

Defendants contend that the 51-year term is not more stringent because Section 42 sets the extended use period as the greater of 30 years or what is provided in the agreement with a state agency.  *See* 26 U.S.C. § 42(h)(6)(D).  But Section 42 includes the qualified contract option where the Declaration does not, so FSA agreed to maintain affordability for that longer duration, subject only to the first exception under the statute, and *precluding FSA from seeking release from the Declaration after the minimum 15-year compliance period*.  Thus, Section 42 itself supports that the qualified contract option was unavailable here.

In concluding as much, the Court rejects Defendants' argument that Section 42's use of the phrase "to the extent" (as compared to "if") renders this interpretation erroneous.  According to Defendants, Congress' use of "to the extent," means that the qualified contract option is *always available* as a baseline process that the parties may make "more stringent."  But the flush language does *not* say, e.g., that the qualified contract option *always* remains available even if in a

---

(. . . continued)

project could be improved upon, [FSA] has indicated that the affordability period can be extended from 30 to 51 years"); *id.* at 10 ("[I]n response to staff's discussions with [FSA], [FSA] has indicated that the affordability period will be increased from 30 years to 51 years."); *id.* at 10–11 (adding as a "project-specific condition[]: . . . Exten[sion of] the period of affordability from 30 years to 51 years"); *id.* at 14–15 (allocating credits on condition that period of affordability is extended to 51 years); *id.* at 22 ("All of these projects will have a restricted affordability term of at least 50 years[.]").

more burdensome state, *nor* say that the qualified contract option shall be modified based on the parties' agreement.  Instead, it says unambiguously that the contract option "*shall not apply* to the extent more stringent requirements" are included in the parties' agreement.  26 U.S.C. § 42(h)(6)(E)(i)(II) (emphasis added).  And here, the more stringent requirement is that FSA was required to maintain affordability during the extended use period of 51 years absent foreclosure/instrument in lieu of foreclosure; thus, the qualified contract option does not apply *to any extent*.  The Court is therefore not persuaded that, in terms of plain meaning, the phrase "to the extent" is any different from "if."[11]  *See Creekside Ltd. v. Alaska Hous. Fin. Corp*., No. 3AN-18-06143CI, 2019 WL 4806180, at *1 (Alaska Super. Mar. 26, 2019) ("Under § 42(h)(6)(E)(i)(II), § 42 property owners cannot exercise the Qualified Contract Option *if* more stringent requirements are provided in the agreement with their state housing agency or by State law." (emphasis added) (footnoted omitted)).

To further support their interpretation, Defendants also offer that the flush language is intended to mean that parties could, for example, agree that the state housing credit agency has two years to find a qualified buyer rather than one,

---

[11]  Section 42 contains other instances where the phrase "to the extent" is essentially interchangeable with the word "if."  *See, e.g.*, 26 U.S.C. § 42(g)(2)(B)(iv), (h)(1)(D)(i), (h)(6)(G)(i).  And this appears to be consistent across other statutes.  *See, e.g.*, 3 U.S.C. § 421(a); 47 U.S.C. § 571(a).

thereby creating more stringent terms to the qualified contract process.  But this example is not persuasive.  The flush language follows Subclause II addressing the qualified contract *exception* to the requirement that a project owner maintain affordability throughout the extended use period.  It does not follow the subparagraph ("Subparagraph (I)"), 26 U.S.C. § 42(h)(6)(I), that sets forth how that qualified contract exception is implemented.[12]  Had Congress intended Defendants' proffered meaning, it would have made more sense for the flush language to follow that later subparagraph.  Moreover, Defendants' example offers little insight here—where the Declaration says nothing about a qualified contract process like in their example, i.e., one that is more burdensome than that set forth in Subparagraph (I).

Creekside, the Alaska case cited above, is instructive.  *Creekside* addressed a nearly identical scenario where the project owner agreed to maintain affordability for a 30-year period (for which it received additional points under Alaska's scoring rubric) and the final agreement provided that this 30-year commitment could only

---

[12]  Subparagraph I reads:

> (I) Period for finding buyer.--The period referred to in this subparagraph is the 1-year period beginning on the date (after the 14th year of the compliance period) the taxpayer submits a written request to the housing credit agency to find a person to acquire the taxpayer's interest in the low-income portion of the building.

terminate in the event of foreclosure or instrument in lieu of foreclosure.  *See* 2019 WL 4806180, at *2.  When the project owner sought a qualified contract before the end of that 30-year period, the Alaska housing agency rejected it based on Section 42's "more stringent" language at issue here, arguing that the project owner's 30-year commitment was more stringent than what Section 42 might otherwise permit, i.e., termination through a qualified contract after only 15 years.  *See id.* *4–5.  The court in *Creekside* agreed with the Alaska housing agency and concluded the qualified contract option was unavailable because the project owner agreed to an affordability requirement more stringent than the federal baseline.  *See id.* *8.  In doing so, it determined the dispute turned on the parties' written agreement (rather than waiver).  It specifically noted that the agreement was silent on the qualified contract option (and instead provided only for foreclosure and an instrument in lieu of foreclosure as terminating events) and thus made unambiguously clear that the agreement's "silence on the Qualified Contract Option shows that the Qualified Contract Option [was] not available." *Id.*[13]  From a commonsense standpoint, the

---

[13]  FSA argues *Creekside* is distinguishable because it applied Alaska law and limited its analysis to the four corners of the parties' covenant.  *See Creekside*, 2019 WL 4806180, at *8.  But, as discussed above, the same is true under Hawaiʻi law.  Defendants also contend that *Creekside* is inapposite because the plaintiff there was the development company and the defendant the state agency.  But who the parties were did not affect the court's analysis nor the case's applicability here.

court in *Creekside* rejected the project owner's argument because, if it were able to terminate the restrictions after fifteen years, this would amount to it receiving something (additional points in the application process) for nothing.  *See id.*[14] *Creekside* provides persuasive support for Plaintiffs' interpretation here that the availability of the qualified contract in Section 42 does not trump the parties' Declaration after considering both the plain terms of that Declaration and Section 42's flush language.[15]

### 3.    Reviewability & Deference

FSA attempts to avoid this result by claiming the Court cannot review the State's actions, or must at least afford deference to the State's actions (and thus its interpretation of Section 42).[16]  FSA first contends that the State's actions are

---

[14]  Logically, the same is true here.  It makes little sense why the State would condition allocation of credits to FSA on FSA making an affordability promise for over fifty years (as compared to FSA's initial offer of thirty years), and note that all those receiving allocations that year had made affordability commitments of fifty years or greater, if FSA could terminate the restrictions after fifteen years regardless.

[15]  Defendants vehemently disagree, claiming *Creekside* is inapposite or was wrongly decided.  FSA's representation of the *Creekside* decision, however, goes beyond the pale.  To express one's disagreement, it is not necessary to describe a judge's reasoning as "botched" and "fatuous," which essentially accuses a judge of arriving at an inanely foolish decision.

[16]  Although the State joined in FSA's motion that raised these arguments, at the hearing, its counsel clarified that the State is *not* arguing that its actions are unreviewable or entitled to deference.

unreviewable under 5 U.S.C. § 701(a) of the Administrative Procedure Act

("APA").  But Plaintiffs claims were not brought under the APA, and so the APA

provision regarding reviewability is irrelevant.  *See Block v. Cmty. Nutrition Inst.*,

467 U.S. 340, 345 (1984) ("The APA confers a general cause of action upon

persons 'adversely affected or aggrieved by agency action within the meaning of a

relevant statute,' 5 U.S.C. § 702, but withdraws that cause of action to the extent

the relevant statute 'preclude[s] judicial review,' 5 U.S.C. § 701(a)(1).").  In

addition, the APA applies to the actions of a federal agency, and so is further

inapplicable here.  *See* 5 U.S.C. § 701(b)(1) (defining agency as "each authority of

the Government of the *United States*" (emphasis added)); *see also Gilliam v.

Miller*, 973 F.2d 760, 764 (9th Cir. 1992); *Resident Council of Allen Parkway Vill.

v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1055 (5th Cir. 1993)

(holding that state housing authority that operated federally subsidized low-income

housing project was not agency whose actions were subject to review under the

APA).  Thus, FSA has not shown that the State's actions are unreviewable.

Further, in adjudicating Plaintiffs' claims, the Court need not defer to the

State's interpretation of Section 42 under *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), as FSA argues.  This

is because "[a] state agency's interpretation of federal statutes is not entitled to the

deference afforded a federal agency's interpretation of its own statutes under

22

[*Chevron*]." *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997). Affording deference to a federal agency with expertise and familiarity in the subject matter of its mandate ensures coherent and uniform construction of that federal mandate nationwide. *See id.* at 1495–96 (citation omitted). That rationale is inapplicable in the context of a state agency. *See id.*[17]

Nor has FSA cited any authority that the result is any different if the state agency is involved in *implementing* federal law in some way. *See Nordbye v. BRCP/GM Ellington*, 246 Or. App. 209, 221, 266 P.3d 92, 99 (Or. Ct. App. 2011) (holding trial court erred in applying *Chevron* deference to state agency's interpretation of Section 42, noting in part that Section 42 grants broad power to prescribe regulations to a federal official rather than any state housing agency); *cf. Arizona v. City of Tucson*, 761 F.3d 1005, 1014–15 (9th Cir. 2014) (holding state environmental agency's interpretation of federal CERCLA statute was not afforded deference, although it could receive "some deference" with respect to its environmental expertise, e.g., regarding cleanup of a specific site).

---

[17]  Indeed, FSA's argument that *Hawaii*'s housing credit agency is a "de facto arm of the federal government" would mean the same is true of *all* housing credit agencies. Affording each such agency deference would not achieve uniform construction of Section 42's mandate nationwide (particularly given some states may have *more than one* housing credit agency, *see* 26 U.S.C. § 42(h)(3)(B)). One need only compare this case to *Creekside* to see that these agencies can interpret the relevant portion of Section 42 differently.

It is true that state housing credit agencies allocate federal tax credits within their states and have the power to choose what projects receive these credits.  *See* 26 U.S.C. § 42(m).  But at the federal level, it is the Department of the Treasury that administers the LIHTC program and has the authority to "prescribe such regulations as may be necessary or appropriate."  26 U.S.C. § 42(n).  The Treasury Department also has the power to deny or recapture an LIHTC in the event of noncompliance.  *See id.* § 42(j).  And it is likewise empowered to issue revenue rulings, publish guidance, and issue notices regarding all provisions of the Tax Code, including those governing LIHTCs.  *See id.* § 7805(a); 26 C.F.R. § 601.601(d).  Thus, the rationale underpinning *Chevron* supports affording deference to the *Treasury Department* regarding the interpretation of Section 42 at issue here, but not to each of the various state housing credit agencies.

In any event, the Court would conclude that *Chevron* deference is inapplicable because the relevant statutory language is unambiguous.  *See Chevron*, 467 U.S. at 842–43.[18]  In light of the above, the Court maintains that Plaintiffs' interpretation of Section 42 controls over Defendants' proposed interpretation.

---

[18]  The Court will not consider Defendants' argument—raised for the first time in reply—that the Hawaiʻi equivalent of *Chevron* deference applies.  *See* LR 7.2.

### 4.      Incorporation by Reference

Defendants alternatively attempt to alter the plain meaning of the parties'

Declaration by arguing that the qualified contract option is incorporated by

reference into the Declaration.  To incorporate a separate writing into a contract,

the contract "must explicitly, or at least precisely, identify the written material

being incorporated and must clearly communicate that the purpose of the reference

is to incorporate the referenced material into the contract (rather than merely to

acknowledge that the referenced material is relevant to the contract, e.g., as

background law or negotiating history)."  *Safeway, Inc. v. Nordic PCL Constr.,*

*Inc.*, 130 Hawaiʻi 517, 527, 312 P.3d 1224, 1234 (App. 2013), *as corrected* (Oct.

31, 2013) (citations omitted); *see also Diamond Resort Haw. Corp. v. Bay W.*

*Kailua Bay, LLC*, Cv. No. 10-00117 DAE-LEK, 2011 WL 776106, at *6 (D. Haw.

Feb. 25, 2011) (noting only specific portion of document referenced can be

incorporated, not non-referenced portion of that document).  The Declaration here

contains many references to Section 42—and especially FSA's *obligations and*

*limitations* under the requirements of Section 42—but makes no specific reference

to a qualified contract *right*.  *See, e.g.*, ECF No. 42-2 at 7 ("this Agreement *and the*

*Section 42 Occupancy Restrictions specified herein* shall commence . . ."

(emphasis added)); *see also id.* ("the Owner shall comply with the *requirements of*

*Section 42 of the Code relating to the Extended Use Period . . .* " (emphasis added)).

While Defendants also cite authority that a law or statute can be incorporated *without* a specific reference, Hawaiʻi law nonetheless recognizes that applicable law becomes a part of a contract as the equivalent of an express provision *except* where the contract discloses a contrary intention or there is a stipulation to the contrary.  *See Kawakami v. Kahala Hotel Inv'rs, LLC*, 142 Hawaiʻi 507, 514, 421 P.3d 1277, 1284 (2018); *Gabriel v. Island Pac. Acad., Inc.*, 140 Hawaiʻi 325, 336, 400 P.3d 526, 537 (2017).  Here, there is a contrary intent expressed in the Declaration—namely that only one of the exceptions to the extended use period provided under Section 42 shall apply to relieve FSA of its 51-year affordability requirements.  Indeed, the very cases Defendants cite make clear that this distinction renders incorporation by reference inappropriate here.  *See Courtesy Oldsmobile, Inc. v. Gen. Motors Corp.*, 329 F. App'x 73, 75–76 (9th Cir. 2009) (noting that relevant state law was incorporated into the contract "[b]ecause the [parties' agreement] does not prescribe a procedure by which [one party] can effect a nonrenewal pursuant to [a provision of the contract]" (citation omitted)); *see also Rendleman v. Bowen*, 860 F.2d 1537, 1541–42 (9th Cir. 1988) (addressing contract that only contained terms required by statute rather than any negotiated agreement; as compared to Section 42 that provides a floor regarding affordability

requirements that parties—like Defendants—may negotiate to make more stringent).  Thus, the doctrine of incorporation by reference does not render the qualified contract option available to FSA.

### 5.    Waiver

In light of the above, Defendants' reliance on waiver is also misplaced.  "To constitute a waiver, there must have existed a right claimed to have been waived[.]"  *Coon v. City & County of Honolulu*, 98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002) (citation omitted).  No such right to a qualified contract option exists in the Declaration and Defendants' reliance on the right as made available in Section 42 is negated by the flush language that limits the availability of the right.

Regardless, waiver may be established by acts and conduct from which an intention to waive may be reasonably inferred.  *See id.*  Here, there is no dispute that the parties were aware Section 42 provides *two* types of exceptions to the extended use period affordability requirements and yet only incorporated *one* of those exceptions as a terminating option in the Declaration.  This is sufficient to infer waiver of any right to the qualified contract option.  *See Fagaragan v. State*, 132 Hawai'i 224, 242, 320 P.3d 889, 907 (2014), *as corrected* (Mar. 21, 2014) (describing the canon of construction expressio unius est exclusio alterius, whereby the express inclusion of one thing implies the exclusion of others in that class (citing Black's Law Dictionary 661 (9th ed. 2009)); *see also* Expressio Unius Est

Exclusio Alterius, *Black's Law Dictionary* (11th ed. 2019) (noting this is also referred to as the "negative-implication canon").[19]

Nor have Defendants offered any authority to support their contention that the Court should examine the parties' conduct over a decade after the Declaration was executed and conclude that a waiver at the time of execution be disregarded in light of this later conduct. *See Midkiff v. Castle & Cooke, Inc.*, 45 Haw. 409, 421, 368 P.2d 887, 894 (1962) ("Since there is no ambiguity in the deed as construed, the parol evidence rule applies. The extrinsic evidence of the surrounding facts and circumstances existing prior to, contemporaneously with and subsequent to the execution of the deed, as alleged in the amended complaint, is not competent to contradict, defeat, modify or otherwise vary the meaning or legal effect of the deed." (citations omitted)).

### 6. Preemption

Defendants also argue that federal preemption precludes voiding the Release. Preemption arises when "compliance with both federal and state regulations is a physical impossibility, or . . . state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

---

[19] While *Fagaragan* involved statutory construction, the Hawaiʻi Supreme Court has also recognized that this "is a fundamental canon of *contractual interpretation*." *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Hawaiʻi 36, 47, 305 P.3d 452, 463 (2013) (emphasis added) (citation omitted).

*Berezovsky v. Moniz*, 869 F.3d 923, 930 (9th Cir. 2017) (citation omitted).  Simply put, applying preemption makes little sense where, as relevant here, the federal law both:  (1) expressly gives way to state law or the parties' agreement if either provides more stringent requirements than federal law; and (2) expressly mandates that the parties' agreement be recorded pursuant to State law as a restrictive covenant.  *See Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*, 423 F.3d 1056, 1076 (9th Cir. 2005) (holding breach of contract claim not preempted where federal regulations contemplated parties could agree to terms different than those contained in regulations and, in those instances, state contract law—not federal regulations—would govern resolution of contract-related questions, e.g., the terms agreed to and whether the contract was breached, and provide a background consistent with and integral to federal law).

Nor do Defendants respond to Plaintiffs' argument that they have not overcome the presumption against preemption that applies here because the issues, including land use, relate to an area of traditional state interest.  *See Berezovsky*, 869 F.3d at 930; *Atay v. County of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (noting that Congressional purpose to preempt state law in field traditionally regulated by states must be "clear and manifest" (citation omitted)).

Defendants appear to claim that Plaintiffs are asking the Court to rule that, under Hawaiʻi law, no project owner could exercise the qualified contract option

unless it also obtained the consent of all beneficiaries of the restrictive covenant, i.e., all current or potential tenants of the low-income housing.  But Plaintiffs do not ask as much.  Instead, Plaintiffs contend that because the Declaration here provides for early termination of the affordability requirements only in the event of foreclosure or instrument in lieu of foreclosure, any other release is only valid if consented to by all beneficiaries.  *See, e.g.*, Restatement (Third) of Property: Servitudes § 7.1 & cmt. b (Am. Law Inst. 2000) (noting that a servitude may be modified or terminated *either* pursuant to its terms, e.g., through foreclosure or the qualified contract option had it been provided, *or* by agreement of the parties, i.e., what Plaintiffs contend must have occurred here given the manner of Release did not comply with the terms of the Declaration).  In other words, had the Declaration provided for the qualified contract option, consent of all beneficiaries would not preclude a project owner's ability to exercise that option.  Without it, though, Hawaiʻi law governs how a party may be released from a restrictive covenant.

### 7.    The Release under Hawaiʻi Law

The parties agree that the Declaration created a real covenant in gross that runs with the land for the benefit of past, present, and prospective tenants of the Project, or alternatively an equitable servitude.  *See* ECF No. 42-2 at 3.

Plaintiffs contend that a servitude may be modified or terminated pursuant to its terms or by agreement of the parties.  *See* Restatement (Third) of Property:

30

Servitudes § 7.1 (2000).  When the parties agree to modify or terminate a servitude, this is often accomplished by executing a release—and a release by the beneficiary of the servitude modifies or extinguishes that beneficiary's interest in the servitude to the extent specified in the release.  *See id.* §§ 7.1 cmt. b; 7.3.  For such a release to be effective, though, it requires the consent of all current beneficiaries entitled to enforce the servitude.  *See id.* § 7.1 cmt. b.  Where, as here, the beneficiaries' interests are in gross, consent of such beneficiaries is required only if the proposed modification or termination would adversely affect a legitimate interest of the beneficiary.  *See id.*; *see also id.* § 7.13 (providing mechanism for court to modify or terminate servitude held in gross when it becomes impossible or impracticable to locate all beneficiaries).

Defendants do not dispute that Plaintiffs—who fit within the class of beneficiaries entitled to enforce the servitude—also necessarily fit within the class of beneficiaries who must consent to any modification or termination of the servitude.  *See* ECF No. 42-2 at 3, 7–8.  Instead, they contend that the Restatement does not reflect Hawaiʻi law.  And while no party has presented the Court with any Hawaiʻi authority on the question of when a servitude may be terminated, the Court notes that the Hawaiʻi Supreme Court has, on more than one occasion, cited favorably to the Restatement (Third) of Property: Servitudes on which Plaintiffs' argument rests.  *See, e.g.*, *Gold Coast Neighborhood Ass'n v. State*, 140 Hawaiʻi

437, 460, 403 P.3d 214, 237 (2017); *Lee v. Puamana Cmty. Ass'n*, 109 Hawai'i 561, 571, 128 P.3d 874, 884 (2006); *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 109, 58 P.3d 608, 620 (2002).[20]  In addition, the Hawai'i Supreme Court frequently looks to the law of other jurisdictions on these topics.  *See, e.g.*, *Gold Coast Neighborhood Ass'n*, 140 Hawai'i at 460, 403 P.3d at 237 (citing New Hampshire law); *Lee*, 109 Hawai'i at 571, 128 P.3d at 884 (citing Georgia, North Carolina, and New Mexico law); *Wailea Resort Co.*, 100 Hawai'i at 109, 58 P.3d at 620 (citing Idaho and Iowa law).  Thus, it is likely that the Hawai'i Supreme Court would consider not only the Restatement of Property, but also rely on the *Nordbye* decision under Oregon law which held that a release of Section 42's low-income housing requirement was invalid where it was not executed pursuant to a term in the relevant agreement or with the consent of all

---

[20]  Defendants cite *Matter of Trust Agreement dated June 6, 1974*, 142 Hawai'i 484, 421 P.3d 692 (table), Nos. CAAP-15-0000409, -0000414, -0000576, -0000598, -0000632, 2018 WL 3199232 (App. June 29, 2018) (mem.).  That case is inapposite because it noted that a *court* may modify a *trust* when circumstances arise that were unanticipated by the settlor and thus modification is necessary to further the purpose of that trust.  If anything, that case supports Plaintiffs' position because the Intermediate Court of Appeals cited favorably to the Restatement (Third) of *Trusts*, *see id.* at *12, indicating that Hawai'i courts look to the *applicable* Restatement as persuasive authority in the absence of or to supplement binding authority.

qualified low-income tenants.[21]  *See Nordbye*, 246 Or. App. at 224–25, 266 P.3d at

101.  The Court therefore concludes that, under Hawaiʻi law, the Release is invalid

because it was not done pursuant to a term in the Declaration and instead executed

by agreement between the Defendants without any consent of beneficiaries like

Plaintiffs.

 The result would be the same even if the Court accepted Defendants' other

argument that the Restatement of Property is inapplicable to an equitable

servitude—a creature of property law—and that the Court must instead look to the

Restatement of Contracts because Hawaiʻi courts examine principles of contract

law when *construing* a restrictive covenant.  *See Pelosi*, 10 Haw. App. at 435–36,

876 P.2d at 1326–27.  "The Restatement (Second) of Contracts provides that *in the*

*absence of terms* in a third party beneficiary contract prohibiting change or

modification of a duty to an intended beneficiary, the promisor and promisee retain

power to discharge or modify the duty by subsequent agreement."  *Karo v. San*

*Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 822 (9th Cir. 1985) (citing

Restatement (Second) of Contracts § 311(1), (2) (1981)) (emphasis added).  The

---

[21]  Indeed, the Hawaiʻi Supreme Court has previously cited favorably to an Oregon
case that *Nordbye* relied on—albeit for a different proposition of property law.
*See, e.g.*, *McNamee v. Bishop Tr. Co.*, 62 Haw. 397, 409 n.18, 616 P.2d 205, 213
n.18 (1980) (regarding whether restrictive covenants limiting the heights of homes
are enforceable for the purpose of protecting a view); *Sandstrom v. Larsen*, 59
Haw. 491, 496 n.3, 583 P.2d 971, 976 n.3 (1978) (same).

Restatement of Contracts thus recognizes that parties to a contract "can by agreement create a duty to a beneficiary which cannot be varied without the beneficiary's consent."  Restatement (Second) of Contracts § 311 cmt. a.  Such an agreement "need not be explicit"; instead, it can be implied based on other terms in the agreement, e.g., "omission of a standard clause reserving a power of modification may manifest an intention to preclude modification; reservation of a limited power may negate a broader power."  *Id.* cmt. b.

Here, the Declaration makes past, present, and prospective qualifying tenants third-party beneficiaries, empowers them to enforce the covenants (including the low-income commitment), and prohibits FSA from terminating the low-income restriction before the end of the 51-year term except in the event of a foreclosure or instrument in lieu of foreclosure, further acknowledging that such beneficiaries cannot be adequately compensated by monetary damages in the event of a default.  *See* ECF No. 42-2 at 3, 7–8.[22]  The Court therefore concludes that the Declaration contains an implied term that, aside from the specific ways to terminate the low-income commitment before the extended use period ceases, this commitment may not otherwise extinguish without the beneficiaries' consent.  *See*

---

[22] *See also* ECF No. 42-2 at 8 ("[FSA] hereby agrees that the representations and covenants set forth herein may be relied upon [by] all persons interested in Project compliance under Section 42 of the Code and the applicable regulations."); *id.* at 3 (FSA agreeing Declaration created restrictive covenants, or equitable servitude, under Hawaiʻi law that run with Project).

34

*Nordbye*, 246 Or. App. at 224–25 & n.13, 266 P.3d at 101 & n.13 (relying on

Oregon law that applied both property theory and contract theory and concluding

release of low-income commitment was void without consent of qualifying

tenants).  Thus, even under Defendants' proffered analysis, the Release is void.

### 8.      Propriety of Claims against Defendants

Finally, the Court rejects Defendants' arguments that they are improper

parties for Plaintiffs' first three claims.  FSA requested a Release that it was not

entitled to under the Declaration and that did not otherwise comply with Hawaiʻi

law.  *See* ECF NO. 42-7 at 2.  It did so even though it agreed that the Declaration's

requirements were paramount and controlling and would supersede any other

conflicting requirements, *see* ECF No. 42-2 at 5, and despite covenanting that it

would not knowingly take or permit any action that would result in a violation "of

the requirements of Section 42 of the Code and applicable regulations of this

Agreement," *id.* at 7.  And FSA otherwise admitted that it agreed to the Release.

*See* ECF No. 121 ¶ 26.

While the State did not have any stated obligations under the terms of the

Declaration, it nonetheless:  was a party to the Declaration that created a covenant

in gross with low-income commitments for the benefit of qualifying tenants;

ultimately accepted FSA's request for a Release; and executed the Release that

terminated FSA's low-income commitment under the Declaration in violation of

the terms of the Declaration and in a manner not otherwise supported by Hawai'i law.  At bottom, in order to assess whether the Release is valid in light of the Defendants' Declaration and Section 42, and in order to award Plaintiffs their requested relief of invalidating the Release, reinstating the Declaration, and enjoining the type of conduct Defendants engaged in herein, both Defendants are necessary parties to this action.[23]

### 9. Declaratory and Injunctive Relief

Plaintiffs seek both declaratory and injunctive relief.  Having concluded that the Release is void and the Declaration should therefore be reinstated, the Court turns to Plaintiffs' request for injunctive relief in the form of a permanent injunction enjoining any further violation of the low-income housing restrictions through at least December 31, 2051.

Before the Court may grant a permanent injunction, Plaintiffs must demonstrate:  (1) they have suffered an irreparable injury; (2) remedies available at law, such as damages, are inadequate to compensate for that injury; (3) the balance of hardships favor them; and (4) the public interest would not be disserved by a permanent injunction.  *See Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 977

---

[23]  Indeed, the State did not respond to Plaintiffs' argument that it is a proper party under the Third Claim for Relief, and a necessary party under Federal Rule of Civil Procedure 19(a), because the claim sounds in *property* law, and objects to the State's unilateral release of a restrictive covenant or equitable servitude contained in the Declaration that the State was party to and that Plaintiffs are beneficiaries of.

(9th Cir. 2017).  Plaintiffs contend that they face irreparable harm in the form of eviction, that the hardships they would suffer in losing a place to live outweigh any financial hardship to FSA, and that ensuring Plaintiffs can remain in their housing is in the public interest.  Having granted Plaintiffs the declaratory relief they seek, Plaintiffs have not demonstrated that injunctive relief is also necessary to prevent them from being evicted or losing their homes.  At the hearing, when pressed on this point, Plaintiffs' counsel argued that Defendants could recommence the qualified contract process; in other words, that the threat Plaintiffs face is capable of repetition but evading review.  Having declared that the qualified contract option is *not* available to FSA, though, there can be no reasonable expectation that Plaintiffs will be subject to the same action again or face eviction based on FSA invoking that qualified contract process.  *See Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018).  Because Plaintiffs have not demonstrated that an injunction is necessary to address a continuing injury or non-speculative future injury, the Court declines to grant the broad injunctive relief Plaintiffs request.

**B.    Plaintiffs' Remaining Claims**

Plaintiffs' remaining claims are premised on the argument that, if the qualified contract option *was* available and the Release is therefore *not* void on the grounds discussed above, the Court should declare the Release void because:  the methodology the State used to offer or advertise the qualified contract is a rule

37

within HRS § 91-1, but was not adopted in compliance with the procedures required under HRS § 91-3; and the State violated Plaintiffs' due process rights in the manner that it administered the qualified contract process, including by failing to offer or advertise Front Street Apartments using "reasonable efforts" as required under federal regulations.  Because the Court has already awarded Plaintiffs the declaratory relief they seek, i.e., voiding the Release and reinstatement of the Declaration, the Court need not reach these alternative arguments—which Plaintiff conceded at the hearing was an outcome they previously endorsed.

In addition, the Court has concerns about reaching these alternative arguments—all premised on the notion that the qualified contract option *was* available—when it has already decided that the qualified contract exception *was not* available.  To determine if a declaratory action is ripe for adjudication, a court must evaluate "whether the facts alleged, under all the circumstances, show that there is a *substantial controversy*, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1124 (9th Cir. 2009) (citation omitted) (emphasis added).  In light of the Court's conclusions under Plaintiffs' first three claims, the Court cannot say that there remains a real, substantial controversy of sufficient immediacy to warrant deciding whether the method the State undertook in offering the qualified contract violated Hawai'i law

38

or Plaintiffs' constitutional rights.  Indeed, doing so would seem to constitute ruling on a hypothetical dispute that could only arise *in the event a qualified contract option was actually available*.

At the hearing, contrary to their prior position, Plaintiffs argued that they are entitled to a ruling on whether the State violated their due process rights here.  But Plaintiffs could not have been owed notice and an opportunity to be heard on a matter that was invalid at the outset and ruling on the issue requires the Court to assume that the qualified contract process was properly invoked.  And while Plaintiffs also noted at the hearing that prevailing on some of these other claims could mean they are entitled to fees, "[t]his interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).  Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs."  *Id*.

Here, given the Court's ruling on the first three claims, the qualified contract option will never be available to Defendants.  Thus, it will never be relevant to the parties whether the methodology the State uses to offer a qualified contract to the

public is a rule under Hawaiʻi law nor what process is due to qualifying tenants when a project owner invokes the qualified contract option. *See Stormans*, 586 F.3d at 1122 ("[R]ipeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies[.]" (internal quotation marks and citation omitted)).

For these reasons, the Court declines to address Plaintiffs' remaining claims for relief and therefore DENIES the parties' pending motions on these claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion as to their First through Third Claims for Relief, and DENIES all other pending motions for summary judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, August 12, 2020.



Jill A. Otake
United States District Judge

Civil No. 18-00218 JAO-KJM, *Tuttle v. Front Street Affordable Housing Partners*; ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR FIRST THROUGH THIRD CLAIMS FOR RELIEF AND DENYING ALL OTHER PENDING MOTIONS